IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>  v.<br><br>Brian Bingham,<br><br>        Defendant. | Case No. 1:22-cr-00092-DLF<br><br>**Objections to Government Exhibit List** |

### A. Unwaived Objections

Mr. Bingham does not waive any objections that could come up during trial to these exhibits, including but not limited to, any objections to lack of foundation or authenticity.

### B. 100 Series

**1. Exhibit 101—CCTV Footage from the East Front House Door— contains footage well before and well after Mr. Bingham is on the scene, rendering it irrelevant and unduly prejudicial.**

Exhibit 101 is CCTV footage at the East Front House Door. The government claims Mr. Bingham eventually makes his appearance at 2:27:40 PM. *See* Exhibit 101A.1. But until then, from 2:20:00 PM until 2:27:40 PM, Mr. Bingham is not present in the footage.

Showing the entirety of Exhibit 101 unedited would only serve to unduly prejudice Mr. Bingham. Well before Mr. Bingham shows up on camera, meaning before the government can claim Mr. Bingham witnessed the actions captured on camera, Capitol protestors were already engaged in disruptive activities. For example, a gentleman with a Don't Tread on Me flag expressed his frustration with situation well before Mr. Bingham got on the scene:



The crowd also dedicates time and effort aggressively arguing or pleading with the police who are blocking their egress:

---

[1] Exhibit 101 at 1:12 (2:21:12 PM). This is redacted because it contains a screenshot from CCTV footage marked as "highly sensitive." An unredacted version will be filed under seal.


[2]

A scuffle eventually breaks out between the police and the crowd, eventually leading the area to be comparably clearer when Mr. Bingham arrives on the scene.[3]

This type of behavior is unduly prejudicial because it risks the jury imputing the behavior of other protestors onto Mr. Bingham while offering no probative value. It is, in other words, inadmissible under Fed. R. Evid. 403 because the unduly prejudicial effect substantially outweighs the probative value.

Even where other protestors are not doing something disruptive or prejudicial, the footage is still irrelevant. Mr. Bingham cannot be convicted on the acts of others. What may have been happening when Mr. Bingham was not in the area is not relevant because it does not make a fact of consequence more or less probable. Therefore, any footage where Mr. Bingham does not appear, nor can the government show Mr. Bingham saw or heard what the footage contains is not relevant under Fed. R. Evid. 401 and is inadmissible under Fed. R. Evid. 402.

To avoid any prejudicial effect the CCTV footage may have, and to ensure only relevant evidence is presented to the jury, Mr. Bingham requests this Court only allow the government to

---

[2] Exhibit 101 at 5:42 (2:25:42 PM).
[3] Exhibit 101 at 7:20–7:35 (2:27:20 PM–2:27:35 PM).

show clips from Exhibit 101 shortly before or shortly after the government claims Mr. Bingham leaves the frame.[4] Based on the government's representations, Mr. Bingham requests Exhibit 101 be confined to only the following timestamps:

      7:35–12:45 (Government alleges Mr. Bingham appears at 7:40/2:27:40 PM and exits at 12:40/2:32:40 PM).

      14:00–15:00 (Government alleges Mr. Bingham appears at 14:05/2:34:05 PM and exits at 14:55/2:34:55 PM).

      22:07–22:22 (Government alleges Mr. Bingham appears at 2:42:12 PM/22:12 and exits at 2:42:17 PM/22:17)

      36:45–37:06 (Government alleges Mr. Bingham appears at 2:56:50 PM/36:50 and exits at 2:57:01 PM/37:01). The government may argue other camera angles will show Mr. Bingham was in the hallway abutting the door this camera footage shows starting at least at 2:55:47 PM, and therefore additional lead in time for this footage is appropriate. But the hallway was packed with people:

---

[4] It is still the government's burden to prove to the jury that the places where the government identifies Mr. Bingham are correct, and the defense declines to relieve them of that burden by conceding his identity in any given footage. However, the defense recognizes any disputes about Mr. Bingham being in footage goes to weight, not admissibility.



Given this, the government will not be able to demonstrate Mr. Bingham likely saw what was happening at the door while Mr. Bingham was in the room abutting the door. Without proof Mr. Bingham saw what was happening at the door, there is no probative value in showing any additional lead-in time for that portion of the video. In addition, the alleged assault happened shortly before Mr. Bingham appears in the last portion of Exhibit 101, meaning Mr. Bingham, under the government's own theory, was too distracted to see what was happening outside.

       The government has also provided three edited versions of Exhibit 101 (edited in both time and to highlight Mr. Bingham's appearance). One of the edited versions address the concerns with showing the whole video, but the two others need to be culled.

       Exhibit 101A.1 begins and ends at appropriate points.

       Exhibit 101A.2 starts well before Mr. Bingham enters the screen, presumably so the government can show the door initially being opened. Specifically, Exhibit 101A.2 starts at 2:41:30 PM, over 30 seconds before Mr. Bingham appears on screen. Mr. Bingham requests only 2:42:07 PM to 2:42:22 PM (00:38 to the end) be played.

Exhibit 101A.3 similarly starts well before Mr. Bingham enters the screen, at 2:56:00 PM. It also continues well past Mr. Bingham exits the screen, ending at 2:58:15 PM. Mr. Bingham requests only 2:56:45 PM to 2:57:01 PM (00:46 to 1:02) be played.

### 2. Exhibit 102—CCTV of the Upper House Door Interior—survives evidentiary scrutiny mostly intact.

Exhibit 102, which shows the back half of the room abutting the Upper House Door Interior, differs from Exhibit 101 in important ways. First, it does not run the risk of unduly prejudicing the jury as much because it does not feature protestors engaged in outwardly subversive behavior (other than trespassing onto Capitol grounds). Second, it provides insight into the environment of the Capitol Mr. Bingham allegedly experienced by capturing the hallway near where Mr. Bingham was allegedly stationed.

As a result, Exhibit 102 does not suffer the same problems as Exhibit 101. The only exception is the last three minutes of the video, which simply shows law enforcement slowly moving towards the door and eventually standing at ease. This is after Mr. Bingham left the inside of the Capitol and is not relevant.

### 3. Exhibit 103—CCTV video of the Upper House Door from Inside the Capitol—suffers the same problems as Exhibit 101.

Exhibit 103, as opposed to Exhibit 102, did not record the hallway near where Mr. Bingham allegedly was. Instead, it focuses itself on the door leading into the Capitol, essentially the other side of what Exhibit 101 captured. As a result, it suffers similar evidentiary problems as Exhibit 101, mostly capturing of what Mr. Bingham was not aware.

Based on the government's representations, Mr. Bingham requests Exhibit 103 be confined to only the following timestamps:

2:12–2:30 (Government alleges Mr. Bingham appears at 2:17/2:42:17 PM and exits at 2:25/2:42:25 PM).

15:42–16:55 (Government alleges Mr. Bingham appears at 16:07/2:56:07 PM and exits at 16:50/2:56:50 PM. However, Exhibit 102 shows Mr. Bingham allegedly entered the room at around 2:55:47 PM, so additional lead-in time is appropriate).

For Exhibit 103, the government again provided edited versions of the video.

Exhibit 103A.1 has a long lead in time showing how the Upper House door was opened. But Exhibit 101 demonstrates Mr. Bingham was not in frame when that happened. Therefore, footage showing the door being opened by protestors inside the Capitol is not relevant and is unduly prejudicial. Exhibit 103A.1 should be culled to only show 2:42:12 PM to 2:42:25 PM (00:28 to the end).

Exhibit 103A.2 also has a long lead in time. This long lead in time is unnecessary because Exhibit 102 shows when Mr. Bingham entered the room, and what he could've seen. Therefore, only 00:43–1:59 (2:55:43 PM-02:56:58 PM) is relevant.

### 4. Exhibit 104—the body worn camera of the alleged victim—contains irrelevant footage.

Exhibit 104 belongs to Officer Agyeman, the alleged victim. The body worn camera begins at 2:51:00 PM, well before the confrontation with Mr. Bingham. It also contains vignettes of what happened *after* the confrontation, ending at around 3:18:31 PM.

Only a small portion of the camera footage should be admitted. The footage not pertaining to Mr. Bingham is irrelevant, prejudicial, and cumulative. The footage not pertaining to Mr. Bingham is irrelevant because it does not advance the government's theory of the case. The footage not pertaining to Mr. Bingham is unduly prejudicial because it shows the actions of other rioters' problematic actions during the footage, which risks imputing their bad behavior onto Mr. Bingham. For instance, at around 2:53:12 PM (2:08 in the video), someone (not Mr. Bingham) can be heard screaming "You fucking pigs," which can prove especially prejudicial in an assault on a police officer case. And finally, the footage not pertaining to Mr. Bingham is cumulative. The government is likely to claim the body worn camera footage demonstrates what Mr. Bingham could have perceived the officers to be doing, but Exhibits 106 and 107 do a *much* better job of that, because those exhibits both 1) show when everyone in the room Mr. Bingham was in turned around at the sound of the officers and 2) do it from Mr. Bingham's perspective:



Exhibit 107, 5:55.  Given Exhibits 106 and 107 remove any guess work from the jury in determining what Mr. Bingham could have heard or seen, the additional information contained in Exhibit 104 fails under a Rule 403 cumulative analysis.

As a result, only the period from shortly before Mr. Bingham entered the Upper House Front Lobby (2:55:43 PM (4:39)) to shortly after he exited (2:56:55 PM (5:52)) is admissible.

Similar to prior exhibits, the government provided edited versions of the exhibit.  Exhibit 104A.1 is the full video with Mr. Bingham highlighted, and Exhibit 104A.2 is a cut down version with Mr. Bingham highlighted.  Both need to be culled in a similar manner to the full video: 2:55:43 PM (4:39) to 2:56:55 PM (6:20).

Exhibit 104A.2 features a similar long preamble as other exhibits.  It starts from the very beginning of the footage.  Only 2:55:43 PM (4:39) to 2:56:55 PM (6:20).

Exhibit 104A.3 is a side-by-side comparison of Exhibit 102 and 104.  Consistent with the other exhibits, it should start at 2:55:43 PM (00:43) to the end of the clip.

### 5. Only the clipped version of Exhibit 105—Officer Hussain's Body Worn Camera—should be played.

The government has noticed the body worn camera of Officer Hussain.  Similar to other exhibits, they have a clipped version, Exhibits 105 and 105A.2, and the full version, Exhibit 105A.1.  The full version contains irrelevant and prejudicial footage.  Thus, only the clipped version, which is confined only to Mr. Bingham's alleged actions, should be played.

### 6. The watermark for Exhibit 107—the Insurgence USA video— should be removed or blurred.

Exhibit 107, which is a social media video, has the watermark "Insurgence USA" plastered on it:



One of the definitions of "insurgence" is an "insurrection",[5] or "an act or instance of revolting against civil authority or an established government."[6]  Mr. Bingham has no connection with Insurgence USA other than appearing in this video and has not adopted the insurgence moniker. As a result, the watermark is prejudicial, especially here where Mr. Bingham is charged with Civil Disorder.  To avoid the jury inherently connecting Mr. Bingham with insurgence or insurrection, Mr. Bingham requests this Court order the watermark removed.

### 7. Exhibit 108—the "Benjamin Reports" social media video— contains a violent vignette completely removed from Mr. Bingham.

Exhibit 108 shows a social media video showing the same scene as Exhibit 101 from a different angle.  However, at the very end of the video, it suddenly cuts to a man punching a window.  Compare:

---

[5] https://www.merriam-webster.com/dictionary/insurgence

[6] https://www.merriam-webster.com/dictionary/insurrection

[7]

to

[8]

---

[7] Exhibit 108A.1 at 1:10.
[8] Exhibit 108A.1 at 1:11.

There is a sudden jump cut, meaning it is unclear at what time this punch took place, and outside the range of the CCTV footage shown in Exhibit 101, meaning the government cannot authenticate the footage without the protestor who took the footage.  This vignette is of dubious relevance, is highly unduly prejudicial, and cannot be authenticated—all of which makes it inadmissible.  Therefore, the following sections should be cut out:

Exhibit 108: 1:05–end;

Exhibit 108A.1: 1:11–end;

Exhibit 108A.2: No edits;

Exhibit 108A.3: 1:10–end.

### 8. Exhibit 111—Officer Mancuso's Body Worn Camera—is wholly cumulative and large portions are devoid of any probative value.

Mr. Bingham appears in Officer Mancuso's body worn camera for a total of about three seconds where he is escorted out of the Capitol:

[9]

This offers the same information as other exhibits at a worse angle.  The rest of the one hour, twenty minutes, and forty-three seconds of the video has nothing to do with Mr. Bingham and,

---

[9] Exhibit 111 at 12:33.

like other body worn camera footage, is prejudicial to him because it features other protestors unaffiliated with Mr. Bingham engaged in subversive activities. It is impossible to even accurately identify Mr. Bingham from Exhibit 111 alone because Exhibit 111 only shows the back of his head. Thus, the probative value is *de minimis* while the cumulative effect is very high, and it should not be admissible.

Furthermore, Exhibit 111 suffers from foundational and hearsay problems. Immediately preceding and following the brief glimpse of Mr. Bingham's head, Officer Mancuso is talking with two other protestors about how they need to move out of the Capitol, and the two protestors are explaining they cannot or will not vacate. Those statements are hearsay. Mr. Bingham is unlikely to have heard these out of court statements since he was being escorted out of the Capitol, so the government cannot claim that they are offering it not for the truth of the matter asserted. Those statements are also irrelevant because Mr. Bingham did not hear them. Furthermore, Officer Mancuso is not on the government's witness list, and Officer Agyeman, who is on their witness list, was on the other side of the densely packed room room and would not be able to verify that the footage is accurate.

Exhibit 111 should not be admitted.

### C. 200 Series

So long as the government only introduces the redacted and edited exhibits found in the 200 series, Mr. Bingham has no objections at this time.

### D. 300 series.

**1. Exhibit 308—USCP 15 Minute Montage with Radio Runs with captions—is inadmissible.**

**a. The montage is not relevant and unduly prejudicial because it does not show any actions taken by Mr. Bingham.**

Mr. Bingham objects to the government's Capitol Montage exhibit as it does not show any of his actions on January 6, 2021. Rather, it shows the actions of others unrelated to him, which is not relevant. The exhibit shows other protestors busting windows down specifically to allow other protestors to enter the Capitol, as well as assaulting officers with trash cans and other

improvised weaponry. This is unduly prejudicial to Mr. Bingham because the jury may seek to hold him responsible for the more outrageous actions of other, unrelated January 6, 2021, protestors.

> **b.  The montage sweeps too broadly to be used by the government to show congressional or governmental disruption.**

To the extent the government is trying to show that Mr. Bingham's actions helped disrupt functions of the government, objects to any footage showing events that occurred before Mr. Bingham reached the Capitol and after he left, as Mr. Bingham cannot be held responsible or liable for any disruption occurring before or after he arrived. In addition, much of the footage does not show the actual congressional disruption—rather, it shows Capitol police dealing with other, unrelated protestors.

> **c.  The montage has inadmissible hearsay in it.**

The montage includes radio chatter describing how different parties breached the Capitol. This radio chatter constitutes out of court statements offered for the truth of the matter asserted— namely, that various sections of the Capitol were breached. *See* Fed. R. Evid. 801(a). That radio chatter included in the montage is therefore inadmissible.

> **2.  Exhibits 303, 304, and 305—signage around the White House— are cumulative given Mr. Bingham's willingness to stipulate to the fact that the Capitol was closed.**

Exhibits 303, 304, and 305 are pictures of signage and fencing around the White House. There is no indication Mr. Bingham saw this signage. Therefore, the only relevance this may have is to demonstrate the Capitol was closed to the public on January 6, 2021.

But Mr. Bingham is willing to stipulate to that element. Therefore, the only thing these pictures carry are a cumulative effect and a risk of confusing the jury that grossly outweigh any probative value they might have.

> **3.  Exhibit 309—the East Front Time Lapse—shows a period removed from Mr. Bingham's actions.**

Exhibit 309 is time lapsed CCTV footage of the East Front entrance of the Capitol. It runs from 1:56:21 PM to 2:11:41 PM.

The problem: according to the government's annotated version of Exhibit 110A.1, Mr. Bingham approaches the East Front House entrance at 2:22:40 PM:



[10]

Mr. Bingham arrived at the scene a full 12 minutes after the time lapse ends. The time lapse is therefore not relevant and inadmissible.

E.   **500 Series**

  1.   **Exhibits 502, 503, and 504—Mr. Bingham's custodial interrogation—are filled with prejudicial information and stories.**

Mr. Bingham had a two-hour long custodial interrogation as captured in Exhibits 502, 503, and 504. Unfortunately, Mr. Bingham recounts certain prejudicial beliefs and stories that are not relevant to this case. These discussions should be excised from the interview.

*Mr. Bingham accused his army commander of identity theft and fraud*. Mr. Bingham recounted how he believes his commander committed identity theft and fraud while in the army. This is prejudicial because the jury, many of whom will be government employees or who work with the military, may react poorly to Mr. Bingham accusing his military command of

---

[10] Exhibit 110A.1 at 2:41 PM.

malfeasance.  It has nothing to do with this case.  Therefore, Exhibit 502, 6:12–7:35 should be excised and the topic should be redacted on the transcript on pages 5 and 6 in Exhibit 504.  This topic resurfaces later and should similarly be excised at 25:54–26:24 in Exhibit 502 and on page 23 in Exhibit 504.  It is once again referenced very briefly at 00:45–00:46 in Exhibit 503 and on page 60 in Exhibit 504.

*Mr. Bingham referenced being under investigation for rape*.  Mr. Bingham makes a sudden sidebar that he had been "under investigation for rape."  Exhibit 504, p. 9.  While Mr. Bingham was eventually cleared of any wrongdoing, allowing the government to talk about that allegation is unduly prejudicial.  As a result, Exhibit 502, 10:46–12:14 should be excised and the topic should be redacted on pages 9 and 10 in Exhibit 504.

*Mr. Bingham talked about how he was hit with a beer bottle by a woman and used incendiary language to describe women.*  Mr. Bingham, presumably trying to ingratiate himself with the two officers interrogating him, regaled them with a story about how a woman attacked him with a beer bottle because his "girlfriend was not something the local girls wanted to see." Exhibit 504, p. 11.  Mr. Bingham called the women "bitches."  Exhibit 504, p. 11.  This story has nothing to do with the case and would only serve to prejudice the jury against Mr. Bingham, as it may give the false impression that Mr. Bingham is misogynist.  As a result, Exhibit 502, 12:50–14:12 should be excised and the topic should be redacted on pages 10–12 in Exhibit 504.  The topic, and a poor joke about women, resurfaces later and should similarly be excised at 21:40–21:48 in Exhibit 502 and on page 19.

*Mr. Bingham references being "scapegoated" relating to drugs.*  Near the end of his interrogation, Mr. Bingham mentioned he hates "always being in jail where I have to argue with criminals about their criminal acts" and was "scapegoated by a cop's kid," explaining "cop's kid'll be the drug dealer, the guy . . . party. [Unintelligible] guy ratted on everybody.  Guy stole the drugs from the locker."  Its unclear what he was referring to, but there are several implications about that tangent that warrant exclusion.  First, that he is "always being in jail," which the jury is going to interpret as criminal malfeasance.  Second, that he was "scapegoated by a cop's kid before" about drugs, which may imply Mr. Bingham is in the drug trade.

Whatever the intended meaning was, the output is unduly prejudicial to Mr. Bingham and not at all relevant to this case. Thus, Exhibit 503, 20:38–21:12 should be excised and the topic on pages 76 and 77 in Exhibit 504 should be redacted.

### 2. Exhibit 509A—a 1946 version of the Capitol Map—is irrelevant.

The government included in their exhibits a map from 1946 of Capitol grounds. This is irrelevant. What the boundaries of the Capitol were 75 years before January 6, 2021, does not advance any element of the offense.

## II. Conclusion

Mr. Bingham requests this Court sustain his objections.

Respectfully submitted,

*/s/ Benjamin Nemec*
Kevin A. Tate
Litigation Resource Counsel-AFD
Nevada State Bar No: 8987
Benjamin Nemec
Assistant Federal Defender
Nevada State Bar No. 14591
411 East Bonneville Avenue, Suite 250
Las Vegas, Nevada 89101
Email: Kevin_Tate@fd.org
         Ben_Nemec@fd.org
Phone: (702) 388-6577

***Counsel for Brian Bingham***

**Dated**:  October 18, 2024